**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| STEPHEN BUSHANSKY, Derivatively on Behalf of MEDPACE HOLDINGS, INC.,<br><br>Plaintiff,<br>v.<br><br>AUGUST J. TROENDLE, JESSE J. GEIGER, KEVIN M. BRADY, SUSAN E. BURWIG, STEPHEN P. EWALD, BRIAN T. CARLEY, FRED B. DAVENPORT, JR., FEMIDA H. GWADRY-SRIDHAR, ROBERT O. KRAFT, CORNELIUS P. "NEAL" McCARTHY III, and DANI S. ZANDER,<br><br>Defendants,<br>-and-<br><br>MEDPACE HOLDINGS, INC., a Delaware corporation,<br><br>Nominal Defendant. | Case No. 1:26-cv-617<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Stephen Bushansky ("Plaintiff"), by the undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Medpace Holdings, Inc. ("Medpace" or the "Company"), against certain of its current and past officers and directors (the "Individual Defendants") for their breaches of fiduciary duties and violations of the federal securities laws. Plaintiff alleges the following based upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief, based upon the investigation of and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, a review of the securities fraud class action lawsuit filed against the Company and certain of its officers, *Durbin v. Medpace Holdings,*

*Inc., et al.*, No. 1:26-cv-00346-SJD (S.D. Ohio) (the "Securities Class Action"), transcripts of the Company's conference calls with financial analysts and investors, published news reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a stockholder derivative action brought against certain of the Company's former and current directors and officers for their breaches of fiduciary duties and violations of the federal securities laws, as well as other misconduct, which resulted in substantial damage to Medpace and its stockholders.

2. Medpace is a clinical research organization ("CRO") that biotechnology and pharmaceutical companies engage to conduct the clinical trials required to bring new drugs to market. When a drug sponsor decides to test a new therapy in human subjects, it typically does not build the necessary trial infrastructure in-house. Instead, it contracts with a CRO such as Medpace to design the clinical study, recruit and enroll patient subjects, manage the trial sites, collect and analyze the trial data, and prepare the materials required for regulatory submission. The Company's operating model centers on the provision of full-service Phase I through Phase IV clinical-development services and therapeutic expertise.

3. Medpace's revenue is derived almost entirely from its contracted trial work — what the industry refers to as the Company's "backlog." When a sponsor signs a contract with Medpace, the value of that contract is added to the backlog. As Medpace performs the trial work over the months and years that follow, the backlog is gradually converted into recognized revenue.

Medpace's business model thus depends on the size and quality of the backlog, and the conversion of that backlog into revenue rather than being lost to cancellation.

4. Medpace, its officers and directors represented publicly that the Company would achieve a "book-to-bill ratio" of approximately 1.15 in the second half of fiscal year 2025.[1] Capitalizing on these bullish statements, the Company's officers and directors sold 557,798 Medpace shares, reaping $311,947,994. After those massive insider sales were accomplished, the Company reported that its book-to-bill ratio came in at 1.04 — barely above breakeven and approximately 11 percentage points below the 1.15 target the Individual Defendants represented to the market before making their sales.

5. Following the disclosure of the Company's true financial condition, the price of Medpace's common stock declined from a closing price of $530.35 per share on February 9, 2026 to $446.05 per share on February 10, 2026 — a decline of approximately 15.9% in a single trading day.

6. The damage continues. On April 6, 2026, a securities class action lawsuit was filed in the United States District Court for the Southern District of Ohio against the Company, and certain of its directors and officers that made the false and misleading statements pled therein, asserting claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of all persons and entities that purchased Medpace common stock between April 22, 2025 and February 9, 2026, inclusive. As a result, the Company will incur substantial costs defending itself and its officers in the Securities Class Action and faces further substantial costs in the event of an adverse judgment or settlement.

[1] The book-to-bill ratio compares the dollar value of new business contracted in a period to the dollar value of revenue recognized in the same period. A ratio above 1.0 indicates that the backlog is growing; a ratio of 1.15 indicates substantial growth.

7. Plaintiff did not make a demand on the Board to institute this action because, as set forth below, such a demand would be futile. The members of the Board are neither disinterested nor independent. Absent this action, Medpace will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures that caused the substantial damages pled herein.

## II. JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9. This Court has jurisdiction over each Defendant named herein because Medpace maintains its headquarters and does substantial business in this District, and, as such, each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice, and because the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the facilities of the national securities markets located in this District, in connection with the acts alleged herein. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

10. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), where the Company maintains its headquarters and conducts substantial business.

## III. THE PARTIES

### A. Plaintiff

11. Plaintiff Stephen Bushansky purchased Medpace stock in its IPO on August 11, 2016, has held Medpace stock continuously since that time, and therefore was a stockholder at the time of the transactions complained of herein. Plaintiff will adequately and fairly represent the interests of Medpace in enforcing and prosecuting its rights and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

### B. Defendants

#### 1. Nominal Defendant

12. Nominal Defendant Medpace Holdings, Inc. is a Delaware corporation with its principal executive offices located at 5375 Medpace Way, Cincinnati, Ohio 45227. Medpace's common stock trades on The Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbol "MEDP."

#### 2. Individual Defendants

13. Defendant August J. Troendle ("Troendle") has been Medpace's CEO and Chairman of the Board since he founded the Company in July 1992 and also served as President through July 31, 2021. Troendle is a named defendant in the Securities Class Action. Since 2024, Troendle received the following compensation from Medpace:

| YEAR | SALARY | BONUS | STOCK AWARDS | OPTION AWARDS | ALL OTHER COMP. | TOTAL |
|---|---|---|---|---|---|---|
| 2025 | $937,417 | $492,350 | N/A | $9,999,999 | $14,000 | **$11,443,766** |
| 2024 | $866,250 | $649,800 | N/A | $7,069,902 | $14,064 | **$8,600,016** |

14. Defendant Jesse J. Geiger ("Geiger") served as President of Medpace from August 1, 2021 until May 31, 2026, and previously served as the Company's CFO and Chief Operating

Officer of Laboratory Operations. Geiger is a named defendant in the Securities Class Action. Since 2024, Geiger received the following compensation from Medpace:

| YEAR | SALARY | BONUS | STOCK AWARDS | OPTION AWARDS | ALL OTHER COMP. | TOTAL |
|---|---|---|---|---|---|---|
| 2025 | $641,667 | $240,700 | N/A | $1,500,003 | $14,000 | **$2,396,370** |
| 2024 | $606,667 | $318,600 | $3,770,000 | N/A | $13,800 | **$4,709,067** |

15. Defendant Kevin M. Brady ("Brady") joined Medpace in November 2018 as Executive Director, Finance, a position he held through July 31, 2021. He has served as Treasurer of the Company since February 2019 and was appointed CFO on August 1, 2021. Brady is a named defendant in the Securities Class Action. Since 2024, Brady received the following compensation from Medpace:

| YEAR | SALARY | BONUS | STOCK AWARDS | OPTION AWARDS | ALL OTHER COMP. | TOTAL |
|---|---|---|---|---|---|---|
| 2025 | $459,695 | $172,450 | N/A | $1,000,052 | $14,000 | **$1,646,197** |
| 2024 | $421,600 | $221,350 | $2,827,500 | N/A | $13,800 | **$3,484,250** |

16. Defendant Susan E. Burwig ("Burwig") has served as Medpace's Executive Vice President ("EVP") of Operations since January 2017. As EVP of Operations, Burwig is responsible for the Company's day-to-day operational functions and reports directly to Defendant Troendle. As disclosed in the Company's 2026 Proxy Statement, Burwig cohabitates with Defendant Troendle. Since 2024, Burwig received the following compensation from Medpace:

| YEAR | SALARY | BONUS | STOCK AWARDS | OPTION AWARDS | ALL OTHER COMP. | TOTAL |
|---|---|---|---|---|---|---|
| 2025 | $710,417 | $497,400 | N/A | $1,500,075 | $15,922 | **$2,723,814** |
| 2024 | $671,667 | $352,700 | $3,770,000 | N/A | $39,702 | **$4,834,069** |

17. Defendant Stephen P. Ewald ("Ewald") has served as Medpace's General Counsel and Corporate Secretary since June 2012. As General Counsel, Ewald is responsible for the

Company's legal affairs and is a member of the Company's senior leadership team. Ewald additionally serves as a co-director with Defendants Troendle and Geiger of LIB Therapeutics, Inc. ("LIB") and CinRx Pharma, LLC ("CinRx"). Since 2024, Ewald received the following compensation from Medpace:

| YEAR | SALARY | BONUS | STOCK AWARDS | OPTION AWARDS | ALL OTHER COMP. | TOTAL |
|---|---|---|---|---|---|---|
| 2025 | $591,507 | $414,150 | N/A | $1,000,052 | $14,000 | **$2,019,709** |
| 2024 | $564,200 | $296,250 | $2,827,500 | N/A | $11,500 | **$3,699,450** |

18. Defendant Brian T. Carley ("Carley") has served as a director of Medpace since July 2016. Carley is Chair of the Audit Committee and a member of the Nominating and Governance Committee. Since 2024, Carley received the following compensation from Medpace:

| YEAR | FEES EARNED OR PAID IN CASH / RSUs | OPTION AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $84,817 (RSUs) | $149,940 | **$234,757** |
| 2024 | $84,735 (RSUs) | $149,916 | **$234,651** |

19. Defendant Fred B. Davenport, Jr. ("Davenport") has served as a director of Medpace since August 2018. Davenport is Chair of the Compensation Committee and a member of the Audit Committee and the Nominating and Governance Committee. Davenport is Medpace's Lead Director. Since 2024, Davenport received the following compensation from Medpace:

| YEAR | FEES EARNED OR PAID IN CASH / RSUs | OPTION AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $115,000 (cash) | $149,940 | **$264,940** |
| 2024 | $115,000 (cash) | $149,916 | **$264,916** |

20. Defendant Femida H. Gwadry-Sridhar ("Gwadry-Sridhar") has served as a director of Medpace since January 2023. Gwadry-Sridhar is a member of the Nominating and Governance Committee. Since 2024, Gwadry-Sridhar received the following compensation from Medpace:

| YEAR | FEES EARNED OR PAID IN CASH / RSUs | OPTION AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $60,000 (cash) | $149,940 | **$209,940** |
| 2024 | $60,000 (cash) | $149,916 | **$209,916** |

21. Defendant Robert O. Kraft ("Kraft") has served as a director of Medpace since July 2016. Kraft is a member of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee. Since 2024, Kraft received the following compensation from Medpace:

| YEAR | FEES EARNED OR PAID IN CASH / RSUs | OPTION AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $77,323 (RSUs) | $149,940 | **$227,263** |
| 2024 | $77,426 (RSUs) | $149,916 | **$227,342** |

22. Defendant Cornelius P. "Neal" McCarthy III ("McCarthy") has served as a director of Medpace since August 2018. McCarthy is a member of the Compensation Committee and the Nominating and Governance Committee. Since 2024, McCarthy received the following compensation from Medpace:

| YEAR | FEES EARNED OR PAID IN CASH / RSUs | OPTION AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $67,445 (RSUs) | $149,940 | **$217,385** |
| 2024 | $67,409 (RSUs) | $149,916 | **$217,325** |

23. Defendant Dani S. Zander ("Zander") has served as a director of Medpace since July 2024. Zander is a member of the Nominating and Governance Committee. Since 2024, Zander received the following compensation from Medpace:

| YEAR | FEES EARNED OR PAID IN CASH / RSUs | OPTION AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $60,000 (cash) | $149,940 | **$209,940** |
| 2024 | $30,000 (cash) | $131,497 | **$161,497** |

24. Defendants Troendle, Geiger, Brady, Burwig, Carley, Davenport, Ewald, Gwadry-Sridhar, Kraft, McCarthy, and Zander are collectively referred to as the "Individual Defendants." Defendants Carley, Davenport, Gwadry-Sridhar, Kraft, McCarthy, Troendle, and Zander are collectively referred to as the "Director Defendants."

## IV. INDIVIDUAL DEFENDANTS' DUTIES

25. By reason of their positions as officers or directors of Medpace and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Medpace and its stockholders fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Medpace in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Medpace and its stockholders to benefit all stockholders equally and not in furtherance of their own personal interests or benefit.

26. The Individual Defendants, because of their positions of control and authority as directors and officers of Medpace, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

27. As officers and directors of a publicly traded company whose common stock was registered with the SEC and trades on Nasdaq, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Medpace's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to

exercise reasonable control and supervision over Medpace's management, policies, and internal controls.

28. At all times relevant hereto, the Individual Defendants were the agents of each other and Medpace and were always acting within the course and scope of such agency.

29. The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Medpace.

**A. Duties Under Medpace's Code Of Business Conduct And Ethics**

30. Medpace's Code of Business Conduct and Ethics (the "Code of Conduct") applies to "all directors, officers and employees" of Medpace ("Covered Persons").

31. The Code of Conduct states that Medpace has adopted the Code of Conduct "to encourage as reasonably necessary":

- Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;
- Full, fair, accurate, timely and understandable disclosures;
- Compliance with applicable governmental laws, rules and regulations;
- Prompt internal reporting of any violations of law or the Code;
- Accountability for adherence to the Code, including fair process by which to determine violations;
- Consistent enforcement of the Code, including clear and objective standards for compliance; and
- Protection for persons reporting any such questionable behavior.

32. The Code of Conduct highlights the Company's commitment to the highest standards of business ethics.

33. The Code of Conduct obligates the disclosure of potential conflicts of interest to the Board, stating "all transactions that would give rise to a conflict of interest involving a director,

the Company's Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer or Controller, or persons performing similar functions or any other executive officer must be approved by the Board. If the Board approves of any such transaction, that approval will not be considered a waiver of this Code."

34. The Code of Conduct identifies, among the situations that "might reasonably be expected to give rise to a conflict of interest," the situation in which a Covered Person serves "on a board of directors or trustees or on a committee of any entity (whether profit or not-for-profit) whose interests reasonably would be expected to conflict with those of the Company."

35. The Code of Conduct establishes a quantitative threshold for "material" customer status, providing that "a company is a 'material' customer if the customer has made payments to the Company in the past year in excess of $200,000 or 5% of the customer's gross revenues, whichever is greater." CinRx Pharma, LLC, with which Defendants Troendle, Geiger, and Ewald are directorially affiliated and which paid Medpace approximately $26.8 million for clinical-trial-related services in the six months ended June 30, 2025 alone, vastly exceeds both prongs of this materiality threshold. LIB Therapeutics, Inc., with which the same three Defendants are also directorially affiliated, likewise exceeded the $200,000 threshold in its dealings with Medpace.

36. The Code of Conduct further provides that "[a]ny waiver of this Code for a director, a Senior Financial Officer or other executive officer may be made only by the Board and will be disclosed to the public as required by law or the [Nasdaq] rules, when applicable." Upon information and belief, the Board has neither approved as a Code-compliant conflict transaction, nor publicly disclosed as a waiver, the related-party arrangements between Medpace and CinRx and between Medpace and LIB through which Defendants Troendle, Geiger, and Ewald maintain their concurrent directorships at the customer entities.

37. The Code of Conduct also establishes a confidential reporting framework, including an "Ethics Hotline that is administered by a third-party and that is available 24 hours a day, 7 days a week," and provides that "[t]he Company prohibits retaliation against a Covered Person who, in good faith, seeks help, reports known or suspected violations, or cooperates with an investigation of any such report."

38. The Code of Conduct requires compliance with all legal and ethical requirements:

> All Covered Persons have an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, testing, approval, manufacture, marketing and sale of our products and product candidates, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. To that end, all Covered Persons are expected to understand and comply with all laws, rules, and regulations that apply to their job responsibilities.

39. The Code of Conduct prohibits insider trading:

> Consistent with the Company's Insider Trading Compliance Policy, Covered Persons are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Covered Persons are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information.

40. The Code of Conduct further prohibits Covered Persons from using "corporate property, information or his or her position with the Company for personal gain."

41. The Code of Conduct requires accurate and honest financial reporting:

> The information in the Company's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable. To ensure the Company meets this standard, all Covered Persons (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Persons are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the

Company's independent auditors, governmental regulators and self-regulatory organizations.

42. The Code of Conduct emphasizes the importance of accurate records: "Accurate and reliable records are crucial to the Company's business. All Company records must be complete, accurate and reliable in all material respects."

43. The Code of Conduct provides that "records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning."

44. The Code of Conduct emphasizes the importance of reporting violations: "All Covered Persons have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to the Company."

**B. Duties Under Medpace's Corporate Governance Guidelines**

45. Medpace's Corporate Governance Guidelines (the "Guidelines") state that each "director is expected to spend the time and effort necessary to properly discharge his or her responsibilities." These responsibilities include:

- Exercising their business judgment in good faith;
- Acting in what they reasonably believe to be the best interest of all stockholders;
- Becoming and remaining well-informed about the Company's business and operations and general business and economic trends affecting the Company; and
- Ensuring that the business of the Company is conducted so as to further the long-term interests of its stockholders.

46. The Guidelines provide that the Lead Director's responsibilities include, "but are not limited to: presiding over all meetings of the Board at which the Chairman of the Board is not present, including any executive sessions of the Independent Directors; approving Board meeting

schedules and contributing to meeting agendas; and acting as the liaison between the Independent Directors and the Chief Executive Officer and Chairman of the Board."

47. The Guidelines further provide that, "when a director becomes aware of circumstances that may adversely reflect upon the director or the Company, such director should offer to resign from the Board."

48. The Guidelines additionally provide that director "[s]ervice on other boards and/or committees should be consistent with the Company's conflict of interest policies." The concurrent service of Defendants Troendle, Geiger, and Ewald as directors of CinRx and LIB — both of which are paying customers of Medpace under the "strategic CRO partnership" and other clinical-trial-related services arrangements described herein — is inconsistent with the Code of Conduct's conflict-of-interest provisions, including the "Service on Boards and Committees" provision quoted above.

49. The Guidelines further provide that "[e]xcept as otherwise permitted by the applicable NASDAQ rules, members of the Audit Committee may not directly or indirectly receive any compensation from the Company other than their directors' compensation, compensation for service on committees of the Board and the receipt of equity incentive awards."

50. The Guidelines provide that the "Board will conduct a periodic assessment of the Board and its committees."

**C. Duties Of Audit Committee Members**

51. Defendants Carley, Davenport, and Kraft — the members of Medpace's Audit Committee at all relevant times — are subject to particularized duties pursuant to the Audit Committee Charter.

52. The Audit Committee's duties are set forth in the Audit Committee Charter. The Audit Committee Charter states that the "purpose of the Audit Committee… is to oversee the

accounting and financial reporting processes of the Company and the audits of the financial statements of the Company." The Audit Committee Charter also specifies the following duties of the Audit Committee, among others, all of which are directly implicated by the misconduct alleged herein.

53. The Audit Committee Charter requires the Committee to review and discuss the Company's annual audited financial statements and quarterly financial statements with management and the Company's independent auditor, including disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations' and recommend to the Board that the audited financial statements be included in the Company's annual report on Form 10-K.

54. The Audit Committee Charter requires the Committee to "discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies."

55. The Audit Committee Charter requires the Committee to "discuss the Company's policies with respect to risk assessment and risk management."

56. The Audit Committee Charter also expressly authorizes the Committee to "conduct or authorize investigations into any matters within the scope of the duties and responsibilities delegated to the Committee."

57. The Audit Committee Charter requires the Committee to "establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters."

58. The Audit Committee Charter requires the Committee to "at least periodically perform an evaluation of the performance of the Committee" and to "annually review and reassess this Charter and submit any recommended changes to the Board for its consideration."

59. Notwithstanding these specific duties, the members of the Audit Committee failed to implement or oversee an effective process for reviewing the integrity of the Company's earnings releases and financial guidance with respect to the Company's book-to-bill ratio, backlog cancellation data, and the concentration of its growth pipeline, and failed to investigate or take action when presented with red flags indicating that the Company's public guidance was inconsistent with its actual cancellation rate.

**D. Duties Of Nominating And Governance Committee Members**

60. Defendants Carley, Davenport, Gwadry-Sridhar, Kraft, McCarthy, and Zander — the members of the Nominating and Governance Committee at all relevant times — are subject to particularized duties pursuant to the Nominating and Governance Committee Charter.

61. The Nominating and Governance Committee Charter requires the Committee, among other duties, to "oversee governance related matters," to "recommend to the Board matters of corporate governance," to "periodically review and reassess the adequacy of the Corporate Governance Guidelines of the Company and recommend any proposed changes to the Board for approval," to "recommend to the Board director nominees for each committee of the Board," and to "periodically review the composition of each Board committee and make recommendations to the Board of any changes to committee membership."

**E. Duties Of Compensation Committee Members**

62. Defendants Davenport, Kraft, and McCarthy — the members of Medpace's Compensation Committee at all relevant times — are subject to particularized duties pursuant to the Compensation Committee Charter.

63. Pursuant to the Compensation Committee Charter, the Compensation Committee is responsible for, among other things, "review[ing] and set[ting] or mak[ing] recommendations to the Board regarding the compensation of the Chief Executive Officer," "review[ing] and approv[ing] or mak[ing] recommendations to the Board regarding the Company's incentive compensation and equity-based plans and arrangements," and, "[t]o the extent that the Company is required to include a 'Compensation Discussion and Analysis' ('CD&A') in the Company's Annual Report on Form 10-K or annual proxy statement," "review[ing] and discuss[ing] with management the Company's CD&A and… consider[ing] whether it will recommend to the Board that the Company's CD&A be included in the appropriate filing."

64. The Compensation Committee Charter expressly grants the Compensation Committee "the authority to conduct or authorize investigations into any matters within the scope of its responsibilities as it deems appropriate, including the authority to request any officer, employee or adviser of the Company to meet with the Committee or any advisers engaged by the Committee."

**F. Duties Under Medpace's Insider Trading Compliance Policy**

65. Medpace's Insider Trading Compliance Policy, amended October 20, 2023 (the "Insider Trading Policy"), applies to "all officers, directors, employees and independent contractors of the Company," including the Individual Defendants.

66. The Insider Trading Policy prohibits any "officer, director or employee" from "purchas[ing] or sell[ing] any type of security while in possession of material, non-public information relating to the issuer of the security." The Insider Trading Policy expressly identifies, as examples of "material information," "corporate earnings, earnings forecasts, or other earnings projections or guidance" and "developments regarding clients, including the commencement or

expansion of a study, successful achievement of enrollment milestones, [or] failure to achieve enrollment milestones."

67. The Insider Trading Policy further prohibits any "officer, director or employee" from purchasing or selling any Company security "during the period beginning on the 14th calendar day before the end of any fiscal quarter of the Company and ending upon the completion of the second full trading day after the public release of earnings data for such fiscal quarter or during any other trading suspension period declared by the Company."

68. The Insider Trading Policy requires that:

> all transactions, except for cash exercises of stock options, in the Company's securities… by officers, directors and such other employees as are designated from time to time by the Board of Directors, the Chief Executive Officer or the General Counsel as being subject to this pre-clearance process… must be pre-cleared by the Company's General Counsel.

69. The Insider Trading Policy provides that the "General Counsel shall have sole discretion to decide whether to pre-clear any contemplated transaction," and that "[t]he Chief Financial Officer shall have sole discretion to decide whether to pre-clear transactions by the General Counsel or persons or entities subject to this policy as a result of their relationship with the General Counsel." Defendant Ewald has served as Medpace's General Counsel and Defendant Brady has served as Medpace's CFO at all relevant times.

70. The Insider Trading Policy further provides that the General Counsel "shall report regularly to the Audit Committee of the Board of Directors all margin, borrowing and pledging arrangements entered into by Covered Persons." Pursuant to this provision, Defendant Ewald was, at all relevant times, the designated reporting officer to the Audit Committee — of which Defendants Carley, Davenport, and Kraft were members — with respect to the trading-related arrangements of Medpace officers and directors.

71. The Insider Trading Policy expressly prohibits short sales, transactions in publicly traded options on Company securities, hedging transactions, and purchases of Company securities on margin or the pledging of Company securities as collateral without pre-clearance.

## V. SUBSTANTIVE ALLEGATIONS

### A. Company Background

72. Medpace is a global provider of clinical research-based drug and medical device development services. Medpace's revenue is derived almost entirely from its contracted clinical trial work, *i.e.,* its "backlog."

73. When a sponsor signs a contract with Medpace, the value of that contract is added to the backlog. As Medpace performs the trial work over the months and years that follow, the backlog is gradually converted into recognized revenue. Medpace's business model thus depends on three closely related metrics: (a) the Company's backlog of awarded clinical-trial business; (b) the rate at which previously awarded business is canceled before or during its conversion into revenue; and (c) the resulting book-to-bill ratio — the ratio of net new business awards entering backlog to revenue recognized in the same period. A book-to-bill ratio above 1.0 indicates that the Company is adding work to its backlog faster than it is recognizing revenue, while a book-to-bill ratio below 1.0 indicates the opposite. These key performance metrics are leading indicators of the Company's financial condition, future revenue trajectory and business prospects.

### B. The Individual Defendants Expressly Admitted Their Awareness of Material Customer Concentration, Backlog Cancellation Rate And Operational Planning Risks

74. The Individual Defendants expressly recognized the material risk to the Company posed by concentrating backlog among customers with uncertain funding, maintaining too narrow a therapeutic focus in its growth pipeline, as well as by backlog cancellations.

75. Each of these material risks was expressly identified by Medpace itself in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2024, filed with the SEC on February 11, 2025 (the "2024 10-K") signed by Defendants Troendle, Geiger, Brady, Carley, Davenport, Gwadry-Sridhar, Kraft, and McCarthy.

76. In the 2024 10-K, the Individual Defendants disclosed that 79% of Medpace's revenue depended on a customer base with "limited access to capital," and that those customers' programs could be cancelled if they became "unwilling or unable to fund the completion of the trial":

> Historically, cancellations and delays have negatively impacted our operating results. Clinical trials can be costly and for the year ended December 31, 2024, ***79% and 17% of our net revenue was derived from small biopharmaceutical companies and mid-sized biopharmaceutical companies, respectively, which may have limited access to capital***. In addition, we provide services to our customers before they pay us for some of our services. ***There is a risk that we may initiate a clinical trial for a customer, and the customer subsequently becomes unwilling or unable to fund the completion of the trial***. In such a situation, notwithstanding the customer's ability or willingness to pay for or otherwise facilitate the completion of the trial, we may be legally or ethically bound to complete or wind down the trial at our own expense.

77. In the 2024 10-K, the Individual Defendants expressly represented that backlog was not a meaningful predictor of future results:

> Because the contracts included in our backlog are generally terminable without cause, we do not believe that our backlog as of any date is necessarily a meaningful predictor of future results. In addition, we may not realize the full benefits of our backlog of contractually committed services if our customers cancel, delay or reduce their commitments under our contracts with them…. ***Our backlog may not be indicative of our future net revenue, and we may not realize all of the anticipated future net revenue reflected in our backlog***. A number of factors may affect the realization of our net revenue from backlog, including: the size, complexity and duration of the projects; the cancellation or delay of projects; and changes in the scope of work during the course of a project.

78. The Individual Defendants similarly admitted that the small-biotechnology customer base on which the Company's backlog depended was funding-constrained and that such

funding constraints were producing cancellations. On February 11, 2025, on the Company's earnings call announcing fourth-quarter and full-year 2024 results and initial 2025 guidance, Defendant Troendle stated:

> Backlog cancellations in Q4 were within our normal range. Our book-to-bill ratio was 0.99, influenced by prior pipeline cancellations as well as the delay of some projects previously expected to enter backlog. RFPs were down slightly in Q4 compared to Q3 as the overall business environment weakened somewhat... This reflects the ***high level of cancellations we experienced in 2024***. All this provides a challenging backdrop to growth in 2025.

79. On the same call, Defendant Troendle further stated: "the environment has tightened everybody's belt some. You know, I think clients are, you know, funding challenged frequently and at least in, you know, our clients."

80. On April 22, 2025 — the first day of the period of the misconduct alleged herein — Defendant Troendle stated, on the Company's first-quarter 2025 earnings call: "Clients often represent having funding arranged, but commitments can be weak, leading to funding issues. This is part of the dynamic causing project cancellations, particularly in pre-backlog stages." Defendant Troendle further stated on the same call that "cancellations have been broad, largely due to funding issues," and acknowledged that "unfunded projects seeking proposals to secure funding" were "leading to a worsening in RFP quality."

81. On July 22, 2025, on the Company's second-quarter 2025 earnings call, Defendant Troendle further stated: "Although funding challenges remain acute for many of our clients, the large majority of those clients with ongoing studies were able to obtain sufficient funding to keep the trials running."

**C. Defendants Troendle, Geiger, and Ewald Had Financial Interests In Companies Contracting With Medpace**

82. Medpace's backlog is concentrated in clinical trials sponsored by small biotechnology companies pursuing therapies for obesity and other metabolic conditions. These

sponsors do not have the financial resources of established pharmaceutical companies. A small biotechnology sponsor generates no product revenue and survives on raised capital, drawing successive infusions from venture investors, follow-on equity offerings, and private placements. Its clinical program lasts only as long as that capital does. A tightening funding market, a disappointing readout from a competitor, or a sponsor's own recognition that its candidate cannot differentiate in a crowded class will end the program, and with it the sponsor's ability to pay the CRO conducting it.

83. The Company's concentration in such sponsors was fueled by, among other things, Defendant Troendle's and other Medpace officers' personal, directorial, and financial entanglement with such companies. For example, Defendants Troendle, Geiger, and Ewald each served as directors of CinRx, a Cincinnati-based biotechnology company engaged in the clinical development of therapeutic candidates – including in the metabolic-disease space – under a "strategic CRO partnership" with Medpace, maintains its headquarters at 5375 Medpace Way, Cincinnati, Ohio — the same address as Medpace's headquarters. As disclosed in the Company's Quarterly Report on Form 10-Q for the period ended June 30, 2025, "[c]ertain executives and employees of the Company, including the [CEO], are members of CinRx's board of managers and/or have equity investments in CinRx, a biotech company," and "[t]he Company and CinRx have entered into several task orders for the Company to perform clinical trial related services." Defendants Troendle, Geiger, and Ewald each serve as directors of CinRx.

84. The Company's relationship with CinRx is described in the 2024 10-K as a "related party transaction." In the 2024 10-K, signed by Defendants Troendle, Geiger, Brady, Carley, Davenport, Gwadry-Sridhar, Kraft, and McCarthy, it is disclosed that:

> Certain executives and employees of the Company, including the chief executive officer, are members of CinRx's board of managers and/or have equity investments

> in CinRx, a biotech company. The Company and CinRx have entered into several task orders for the Company to perform clinical trial related services. During the years ended December 31, 2024, 2023 and 2022, the Company recognized total revenue from CinRx of $28.3 million, $15.8 million and $15.0 million in the Company's consolidated statements of operations, respectively. As of December 31, 2024 and 2023, the Company had Advanced billings from CinRx of $5.2 million and $2.5 million in the consolidated balance sheets, respectively. As of December 31, 2024 and 2023 the Company had Accounts receivable and unbilled, net from CinRx of $1.4 million and $1.9 million in the consolidated balance sheets, respectively. The Company had Prepaid expenses and other current assets with CinRX of $0.1 million and $0.2 million in the consolidated balance sheets at December 31, 2024 and 2023, respectively. Certain affiliates of CinRx included in previous reported periods are no longer disclosed due to changes in the affiliate relationship.

85. Further, LIB is another Cincinnati-based late-stage biopharmaceutical company with a CRO relationship with Medpace that Defendants Troendle, Geiger, and Ewald also have financial interests in, serving as directors. As disclosed in the Company's Form 10-Q for the quarter ended June 30, 2025, as of June 30, 2025, LIB owed Medpace approximately $1.3 million in billed and unbilled receivables for clinical-trial services performed.

86. The Company's financial relationship with LIB is described in the 2024 10-K as a "related party transaction." In the 2024 10-K, it is disclosed that:

> Certain executives and employees of the Company, including the chief executive officer, are members of LIB's board of managers and/or have equity investments in LIB. The Company entered into a MSA dated November 24, 2015 with LIB, a company that engages in research, development, marketing and commercialization of pharmaceutical drugs. Subsequently, the Company and LIB have entered into several task orders for the Company to perform clinical trial related services. The Company recognized total revenue from LIB of $21.7 million, $43.7 million and $40.5 million during the years ended December 31, 2024, 2023 and 2022, respectively, in the Company's consolidated statement of operations. As of December 31, 2024 and 2023, the Company had, from LIB, Advanced billings of $9.5 million and $7.6 million in the consolidated balance sheets, respectively. In addition, the Company had Accounts receivable and unbilled, net from LIB of $2.8 million and $0.5 million in the consolidated balance sheets at December 31, 2024 and 2023, respectively.

87. The CinRx and LIB related-party relationships are material to Medpace's financial condition. Medpace recognized revenue from CinRx of approximately $13.6 million in the six months ended June 30, 2024 and approximately $26.8 million in the six months ended June 30, 2025 — a year-over-year increase of approximately 97%. CinRx revenue in the second quarter of 2025 alone was approximately $15.1 million, compared to approximately $7.3 million in the second quarter of 2024. As of December 31, 2024, Medpace's related-party accounts receivable and unbilled balance — reflecting in substantial part the CinRx and LIB relationships — was approximately $4.2 million, compared to approximately $2.4 million one year earlier.

88. Medpace purports to maintain a Related Person Transaction Policy and Procedures setting forth the policies and procedures for the review and approval or ratification of related person transactions. In the Proxy filed by Medpace with the SEC on April 2, 2025, it is represented that:

> Under the policy, management is required to present to the Audit Committee each proposed related party transaction. In reviewing and approving any such transactions, our Audit Committee is tasked to consider all relevant facts and circumstances, including, but not limited to, whether the transaction is on terms comparable to those that could be obtained in an arm's length transaction and the extent of the related person's interest in the transaction. If advance Audit Committee approval of a related party transaction is not feasible, then the transaction may be preliminarily entered into by management upon prior approval by the Chairperson of the Audit Committee, subject to ratification of the transaction by the Audit Committee at the Audit Committee's next regularly scheduled meeting. Any related party transaction must be approved or ratified by the Audit Committee in order to be consummated or continue, as applicable. Management is responsible for updating the Committee as to any material changes to any approved or ratified related party transaction and for providing a status report at least annually of all current related party transactions at a regularly scheduled meeting of the Audit Committee. No director may participate in approval of a related party transaction for which he or she is a related party.

89. In the Proxy, the relationships with CinRx and LIB are again described as related person transactions.

90. By reason of their CinRx and LIB board service, Defendants Troendle, Geiger, and Ewald had access to non-public information regarding the funding status, clinical-trial progression, and revenue trajectory of those related-party customers. As shown above, related-party revenue declined approximately 21% year-over-year in the third quarter of 2025, from $15.5 million in Q3 2024 to $12.2 million as disclosed in the Q3 2025 Form 10-Q, and LIB revenue declined approximately 50% from fiscal year 2023 to fiscal year 2024, from $43.7 million to $21.7 million as disclosed in the Q3 2025 10-Q. Troendle, Geiger, and Ewald had direct visibility into these declining revenues — information that was not reflected in Defendants Troendle's and Brady's October 23, 2025 representations that the Company's third-quarter outperformance was "pretty broad-based" and "not isolated to a handful of studies."

91. In the fourth quarter of 2025, cancellations reached the highest absolute and percentage levels the Company had recorded in over a year, as Defendant Troendle himself acknowledged on the February 10, 2026 conference call.

92. Despite the fact that the real-time cancellation data and the Company's concentration on unreliable customers did not support robust revenue growth, Medpace publicly committed, on three successive quarterly earnings calls held subsequent to the filing of Current Reports on Form 8-K filed with the SEC on April 21, July 21, and October 22, 2025, to achieving a "book-to-bill ratio" of approximately 1.15 in the second half of fiscal year 2025 as set forth at Section V.E., below.

### D. The Individual Defendants Allow The Dissemination Of Materially False And Misleading Statements Regarding Backlog Cancellations And Pipeline Concentration

93. On April 21, 2025, Medpace filed a Current Report on Form 8-K with the SEC, attaching a press release disclosing the Company's financial results for the first quarter of fiscal year 2025. The press release reported first-quarter revenue of $558.6 million, a year-over-year

increase of 9.3%, net new business awards of $500 million representing a net book-to-bill ratio of 0.90x, a decline of 18.8% from the prior year, and ending backlog of approximately $2.85 billion, a decrease of 2.1% from the prior year.

94. On April 22, 2025, Medpace held a conference call with financial analysts and investors to discuss the Company's financial results for the first quarter of fiscal year 2025. During the call, Defendant Geiger reiterated the financial information reflected in the 8-K:

> Revenue for the first quarter of 2025 was $558.6 million, which represents a year-over-year increase of 9.3%. Net new business awards entering backlog in the first quarter decreased 18.8% from the prior year to $500 million, resulting in a 0.9 net book-to-bill. And ending backlog as of March 31, 2025, was approximately $2.8 billion, a decrease of 2.1% from the prior year.

95. During the same call, in response to an analyst's question regarding the achievability of a 1.15 book-to-bill ratio in the back half of 2025, Defendant Troendle represented:

> Yes. Well, that's kind of a difficult hypothetical, what kind of downside is there? That depends on how bad the environment gets if cancellations continue kind of the way they have of recent past and particularly this past quarter and some of the quarters last year. We're going to be in the same kind of place we've been, somewhere around 1, I guess. I think that's kind of the downside. But we still have opportunities to, again paths toward getting to 1.15.

96. When the same analyst asked Defendant Troendle to confirm that, if the funding environment improved, Medpace could achieve a 1.15 book-to-bill ratio in the back half of 2025, Defendant Troendle responded: "Correct."

97. On July 21, 2025, Medpace filed a Current Report on Form 8-K with the SEC, attaching a press release disclosing the Company's financial results for the second quarter of fiscal year 2025. The press release reported second-quarter revenue of $603.3 million, a year-over-year increase of 14.2%, net new business awards of $620.5 million representing a net book-to-bill ratio of 1.03x, and ending backlog of approximately $2.87 billion, a decrease of 1.8% from the prior

year. Simultaneously, the Company raised its full-year 2025 revenue guidance by $280 million at the midpoint.

98. On July 22, 2025, Medpace held a conference call with financial analysts and investors to discuss the Company's financial results for the second quarter of fiscal year 2025. During the call, Defendant Troendle reiterated the financial results disclosed in the 8-K and represented that the Company continued "to see a strong potential for book-to-bills returning to above 1.15x in Q3":

> RFP flow in Q2 continued to be strong, and we saw an increase in rate of decisions. Total pending RFP dollars were down on the quarter and our award notifications were strong. ***Cancellations were down across the pipeline and awards recognized in the backlog were the highest in the past 5 quarters with a book-to-bill of 1.03x in the second quarter of 2025. We continue to see a strong potential for book-to-bills returning to above 1.15x in Q3.*** Although funding challenges remain acute for many of our clients, the large majority of those clients with ongoing studies were able to obtain sufficient funding to keep the trials running. The funding environment has been stable to improve.

99. Defendant Troendle further represented that the Company was ***raising*** its full-year 2025 revenue guidance by $280 million at the midpoint due to several factors, including "fewer cancellations" and "accelerated client decisions."

100. In response to an analyst's question regarding the Company's booking expectations for the second half of 2025, Defendant Troendle represented:

> Yes. As I said in my prepared comments, we do believe that there's a reasonable chance of getting book-to-bills back over 1.15x, which implies a considerable increase in bookings as our revenue is also growing. So yes, we do expect bookings to increase. Now again, that's always dependent upon cancellations, which were very well behaved in this quarter.

101. On October 22, 2025, after the close of trading, Medpace filed a Current Report on Form 8-K with the SEC, attaching a press release disclosing the Company's financial results for the third quarter of fiscal year 2025. The press release reported third-quarter revenue of $659.9 million, a year-over-year increase of 23.7%, net new business awards of $789.6 million

representing a record net book-to-bill ratio of 1.20x — an increase of 47.9% from the prior year — and ending backlog of approximately $3.0 billion, an increase of 2.5% from the prior year.

102. On October 23, 2025, Medpace held a conference call with financial analysts and investors to discuss the Company's financial results for the third quarter of fiscal year 2025. Defendant Troendle represented:

> Good day, everyone. Cancellations were well behaved in Q3, permitting record net bookings and a net book-to-bill of 1.20. RFP quality remains solid with decisions progressing on a usual tempo. Initial award notifications were strong, and our total dollar value of awarded work not yet recognized in the backlog was up approximately 30% in Q3 on a year-over-year basis. We are making good progress toward refilling our pipeline of opportunities.

103. During the same call, Defendant Geiger represented:

> Revenue in the third quarter of 2025 was $659.9 million, which represents a year-over-year increase of 23.7%. Net new business awards entering backlog in the third quarter increased 47.9% from the prior year to $789.6 million, resulting in a 1.20 net book-to-bill. Ending backlog as of September 30, 2025, was approximately $3 billion, an increase of 2.5% from the prior year.

104. In response to an analyst's question regarding expectations for the fourth quarter book-to-bill ratio, Defendant Troendle represented:

> Yes. We're not giving a guide to '26, and I don't know where the bookings are going to come out. So I'm not going to get into trying to set them. We did say that — second half of '25, we did think that we could get to 1.15. We thought a reasonable chance of getting there, and that's kind of where we're looking at towards Q4 as sort of the target. And I think that looks reasonable, but I'm not going to get into next year yet.

105. In response to a follow-up question regarding the breadth of the Company's third-quarter outperformance, Defendant Brady represented:

> Yes, Dan, I'd say it's pretty broad-based. I mean, certainly, some of that was just influenced by the pass-throughs. I mean pass-throughs continue to increase. I think for the quarter, we were right around 42%. So that certainly had an influence. But then also just the carryover of the improvements that we saw coming out of our conversation in Q2, where we saw improved funding in those studies progressing forward, the fewer cancellations in the second quarter and that translating further into the third quarter. So it's pretty broad-based. I wouldn't say it's isolated to a handful of studies.

106. Contrary to Defendant Brady's representation that the Company's third-quarter outperformance was "pretty broad-based" and "not isolated to a handful of studies," the Company's own Form 10-Q for the quarter ended September 30, 2025 — filed with the SEC on October 23, 2025 (the same day as the conference call) and signed by Defendants Troendle and Brady — disclosed that revenue from the Company's related-party clinical-trial customers had declined approximately 21% year-over-year in the third quarter of 2025, from $15.5 million in the three months ended September 30, 2024 to $12.2 million in the three months ended September 30, 2025. As directors of CinRx and LIB —related-party clients of the Company — Defendants Troendle, Geiger, and Ewald had direct visibility into the declining trajectory of those revenues as it was occurring.

**E. The Company Discloses A Book-To-Bill Ratio Well Below The 1.15 Ratio Represented By Defendants Throughout The Second Half of 2025**

107. On February 9, 2026, Medpace filed a Current Report on Form 8-K with the SEC, attaching a press release disclosing, among other things, the Company's financial results for the fourth quarter of fiscal year 2025, including a fourth-quarter book-to-bill ratio of 1.04, barely above breakeven and ***eleven percentage points*** below the 1.15 target that Defendants had represented as achievable throughout the second half of fiscal year 2025. The press release stated:

> Backlog as of December 31, 2025 increased 4.3% to $3,027.2 million from $2,902.2 million as of December 31, 2024. Net new business awards were $736.6 million, representing a net book-to-bill ratio of 1.04x for the fourth quarter of 2025, as compared to $529.7 million for the comparable prior-year period.

108. On February 10, 2026, Medpace held a conference call with financial analysts and investors on which Defendant Troendle acknowledged that backlog cancellations were the highest they had been in over a year and represented that the Company did not anticipate such a spike in cancellations in the fourth quarter:

> Cancellations were elevated again in Q4. ***Backlog cancellations in absolute and percent terms were the highest they've been in over a year.*** This resulted in a lower than anticipated net book-to-bill ratio of 1.04. The good news is that with a backlog conversion rate of 23.6%, our book-to-bill rate does not need to be very high to generate growth. I see no reason to expect the higher level of cancellations to continue, ***but did not anticipate the spike in Q4.***

109. During the same call, when asked to characterize the elevated fourth-quarter cancellations, Defendant Troendle acknowledged that "[c]ancellations were a little bit skewed towards the metabolic area" and that the metabolic area had "been growing quite a bit," directly contradicting Defendant Brady's October 23, 2025 representation that the Company's outperformance was "pretty broad-based" and "not isolated to a handful of studies."

110. Following Defendant Troendle's metabolic-area admission, David Windley, a securities analyst at Jefferies, directly raised the concentration risk on the same conference call:

> August, I wanted to kind of philosophically ask around therapeutic area concentration. You mentioned oncology being very strong and metabolic right behind it. And as people have seen and you've highlighted, metabolic has been on this very steep growth ramp. I guess, to me, the difference between those two areas is, like, oncology is spread across tens, if not hundreds, of different kind of micro indications, and metabolic seems to be very concentrated in diabetes and obesity. And so I wondered how you think about the concentration risk in metabolic and the crowding and the potential for cancellations like you apparently just saw because people say, you know, don't have enough differentiation.

111. In response, Defendant Troendle acknowledged that, "of late," the Company's metabolic exposure was "heavily kind of toward the obesity, diabetes area specifically." Another analyst, Charles Rhyee of TD Cowen, separately asked whether the Q4 cancellations were "more from either trials failing or decisions by sponsors to abandon programs," to which Defendant Troendle responded: "Things that start up, they restructure. They change. They decide to end study early. So there were a number of studies that ended early because of compound performance."

112. Following these disclosures, the price of Medpace's common stock declined from a closing price of $530.35 per share on February 9, 2026 to $446.05 per share on February 10, 2026 — a decline of approximately ***15.9%*** in a single trading day.

113. Securities analysts who had been following Medpace expressed surprise at the Company's disclosure. On February 9, 2026, Baird Equity Research published a report titled "Expect Shares Under Pressure Tomorrow," highlighting Medpace's Q4 bookings miss and noting that "MEDP's peer-relative valuation is stretched well beyond norm." Similarly, on February 10, 2026, Truist published a report titled "Let's Play Q&A: Digging into 4Q Cancellations and the Roadmap Into 2026," lowering Medpace's price target to $539 from $555 per share and noting that "the sequential decline in B2B and the increase in cancellations came as a surprise to many investors."

**F. Medpace's False And Misleading Proxy Statements**

114. On April 2, 2025, the Company filed its 2025 Proxy Statement with the SEC and solicited stockholder votes to, among other things, re-elect Defendants Troendle and Zander to the Board and approve, on an advisory basis, the compensation of the Company's named executive officers. The 2025 Proxy Statement was authorized by the Board, including Defendants Troendle, Carley, Davenport, Gwadry-Sridhar, Kraft, McCarthy, and Zander.

115. The 2025 Proxy Statement represented that the Board exercises active risk oversight:

> Risk assessment and oversight are an integral part of our governance and management processes. Our management is responsible for our day-to-day risk management activities. Our Board oversees the implementation of risk mitigation strategies by management and encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. … Our Board administers this oversight function directly through the Board as a whole, as well as through various standing committees of the Board that address risks inherent in their respective areas of reporting and compliance risk, and the Compensation Committee's oversight of compensation-related risk.

116. The 2025 Proxy Statement further represented that the Audit Committee is responsible for the integrity of the Company's financial statements and the review of earnings releases and financial guidance:

> The purpose of our Audit Committee is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company. In fulfilling its purpose, our Audit Committee has the following duties: … reviewing and discussing with management and the independent registered public accounting firm our annual and quarterly financial statements and related disclosures; … discussing the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies; … discussing our risk assessment and management policies….

117. The 2025 Proxy Statement further represented that the Company's compensation practices do not encourage excessive and unnecessary risk-taking:

> Our management and the Compensation Committee review our compensation practices and policies with regard to risk management. We have reviewed our programs and determined that there are no practices or policies that are likely to lead to excessive risk-taking or have a material adverse effect on the Company.

118. The 2025 Proxy Statement further represented that the Company is committed to good corporate governance practices designed to promote the long-term interests of stockholders:

> We have a written Code of [Conduct] that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. … In addition, we intend to post on our website all disclosures that are required by law or the rules of [Nasdaq] concerning any amendments to, or waivers from, any provision of the Code.

119. The representations in the 2025 Proxy Statement regarding the Individual Defendants' risk oversight practices were false and misleading and omitted material information. Contrary to the representations made in the 2025 Proxy Statement, and as more fully set forth in Section IV above, the Individual Defendants were required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Medpace's core operations and making truthful,

accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's book-to-bill ratio guidance, its backlog cancellations, and the concentration of its growth pipeline; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

120. On May 19, 2025, the Company filed with the SEC a Current Report on Form 8-K announcing, among other things, the re-election of Defendants Troendle and Zander as directors and the approval, on an advisory basis, of the compensation of the Company's named executive officers, pursuant to the solicitations in the 2025 Proxy Statement.

### G. Medpace Is Sued In The Securities Class Action

121. On April 6, 2026, the Securities Class Action, captioned *Durbin v. Medpace Holdings, Inc., et al.*, No. 1:26-cv-00346-SJD, was filed in the United States District Court for the Southern District of Ohio against Medpace, Troendle, Geiger, and Brady, asserting claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of all persons and entities that purchased or otherwise acquired Medpace common stock between April 22, 2025 and February 9, 2026, inclusive. As a result, the Company will incur substantial costs defending itself and its officers in the Securities Class Action and faces further substantial costs in the event of an adverse judgment.

### H. Insider Trading By The Insider Seller Defendants

122. While the materially false and misleading statements and material omissions regarding the Company's projected second-half 2025 book-to-bill ratio and the state of its backlog cancellations inflated Medpace's stock price to all-time highs above $600 per share, eight of the Individual Defendants, Defendants Troendle, Davenport, Kraft, and McCarthy, four of the seven members of the Board, as well as senior officers Geiger, Brady, Burwig, and Ewald (collectively, the "Insider Seller Defendants") sold approximately 557,798 shares of Medpace stock, reaping

approximately $311,947,994 in aggregate proceeds. The three Insider Seller Defendants who personally made the materially false and misleading statements at issue, Defendants Troendle, Geiger, and Brady, alone sold 466,250 shares for aggregate proceeds of approximately $260,423,386.

123. Defendant Troendle, the Company's CEO, Chairman, and founder, sold 364,918 shares of Medpace common stock in eleven separate open-market transactions for aggregate proceeds of approximately $207,589,733. From November 12-December 3, 2025, less than a month period after the materially false and misleading statements were made on the October 23, 2025 earnings call, and before the February 10, 2026 corrective disclosure that caused the Company's stock price to collapse by 15.9% in a single trading day, Troendle sold approximately 248,874 shares for proceeds of approximately $150 million at prices ranging from $590.69 to $611.02 per share — the all-time high price range for Medpace common stock. As Troendle's Forms 4 filed with the SEC disclose, each of these sales was effected pursuant to a limit order placed during an open trading window and was not made pursuant to a Rule 10b5-1 trading plan. Troendle's individual trading is set forth in the following table:

| TRADE DATE | SHARES SOLD | AVG. PRICE/SHARE | PROCEEDS |
|---|---:|---:|---:|
| July 28, 2025 | 48,487 | $451.69 | $21,901,093 |
| August 27, 2025 | 620 | $475.00 | $294,500 |
| August 29, 2025 | 37,393 | $475.88 | $17,794,383 |
| November 12, 2025 | 10,440 | $602.32 | $6,288,183 |
| November 14, 2025 | 20,794 | $594.02 | $12,352,076 |
| November 18, 2025 | 31,053 | $591.79 | $18,376,705 |
| November 20, 2025 | 28,688 | $593.68 | $17,031,557 |
| November 24, 2025 | 101,417 | $611.02 | $61,967,338 |
| November 26, 2025 | 56,482 | $603.28 | $34,074,470 |
| December 1, 2025 | 28,876 | $592.70 | $17,114,847 |

| TRADE DATE | SHARES SOLD | AVG. PRICE/SHARE | PROCEEDS |
|---|---|---|---|
| December 3, 2025 | 668 | $590.69 | $394,581 |
| **TOTAL** | **364,918** | | **$207,589,733** |

124. Defendant Geiger, the Company's former President, sold 86,332 shares of Medpace common stock in three transactions for aggregate proceeds of approximately $45,611,843. By the end of his November 5, 2025 sale, Geiger had reduced his direct holdings by approximately 59%. Geiger's individual trading is set forth in the following table:

| TRADE DATE | SHARES SOLD | AVG. PRICE/SHARE | PROCEEDS |
|---|---|---|---|
| July 24, 2025 | 41,801 | $453.11 | $18,940,451 |
| October 27, 2025 | 23,028 | $602.00 | $13,862,915 |
| November 5, 2025 | 21,503 | $595.66 | $12,808,477 |
| **TOTAL** | **86,332** | | **$45,611,843** |

125. Defendant Brady, the Company's CFO and Treasurer, sold 15,000 shares of Medpace common stock in two transactions for aggregate proceeds of approximately $7,221,810. After his November 21, 2025 stock sale, Brady had reduced his direct holdings by approximately 67%. Brady's individual trading is set forth in the following table:

| TRADE DATE | SHARES SOLD | AVG. PRICE/SHARE | PROCEEDS |
|---|---|---|---|
| July 24, 2025 | 12,000 | $454.23 | $5,450,760 |
| November 21, 2025 | 3,000 | $590.35 | $1,771,050 |
| **TOTAL** | **15,000** | | **$7,221,810** |

126. Five additional Individual Defendants — Burwig, Ewald, Davenport, Kraft, and McCarthy — collectively sold an additional 91,548 shares of Medpace common stock for aggregate proceeds of approximately $51,524,608. As each of these Defendants' Forms 4 filed with the SEC discloses, each of their sales described herein was effected pursuant to a limit order placed during an open trading window and was not made pursuant to a Rule 10b5-1 trading plan.

127. Defendant Burwig's individual trading is set forth in the following table:

| TRADE DATE | SHARES SOLD | AVG. PRICE/SHARE | PROCEEDS |
|---|---|---|---|
| July 28, 2025 | 7,500 | $450.14 | $3,376,050 |
| September 3, 2025 | 10,000 | $480.00 | $4,800,000 |
| October 27, 2025 | 2,000 | $605.01 | $1,210,020 |
| November 11, 2025 | 18,000 | $605.00 | $10,890,000 |
| November 24, 2025 | 20,000 | $609.15 | $12,183,000 |
| **TOTAL** | **57,500** | | **$32,459,070** |

128. Defendant Ewald's individual trading is set forth in the following table:

| TRADE DATE | SHARES SOLD | AVG. PRICE/SHARE | PROCEEDS |
|---|---|---|---|
| July 28, 2025 | 3,000 | $450.00 | $1,350,000 |
| October 27, 2025 | 15,230 | $598.85 | $9,120,486 |
| **TOTAL** | **18,230** | | **$10,470,486** |

129. Defendant Davenport's individual trading is set forth in the following table:

| TRADE DATE | SHARES SOLD | AVG. PRICE/SHARE | PROCEEDS |
|---|---|---|---|
| April 24, 2025 | 1,712 | $301.82 | $516,716 |
| October 30, 2025 | 5,972 | $581.88 | $3,474,987 |
| **TOTAL** | **7,684** | | **$3,991,703** |

130. Defendant Kraft's individual trading is set forth in the following table:

| TRADE DATE | SHARES SOLD | AVG. PRICE/SHARE | PROCEEDS |
|---|---|---|---|
| November 14, 2025 | 6,472 | $591.85 | $3,830,453 |
| **TOTAL** | **6,472** | | **$3,830,453** |

131. Defendant McCarthy's individual trading is set forth in the following table:

| TRADE DATE | SHARES SOLD | AVG. PRICE/SHARE | PROCEEDS |
|---|---|---|---|
| August 19, 2025 | 1,662 | $465.04 | $772,896 |
| **TOTAL** | **1,662** | | **$772,896** |

132. Defendant Davenport's October 30, 2025 sale of 5,972 shares occurred just seven days after the October 23, 2025 earnings call on which Defendants Troendle and Brady made the materially false and misleading representations regarding the Company's third-quarter cancellation rate, book-to-bill outlook, and the breadth of its revenue performance, and Defendant Kraft, a member of both the Audit Committee and the Compensation Committee, whose committee responsibilities expressly included "discussing the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies," sold 6,472 shares on November 14, 2025 at the all-time high price range for proceeds of approximately $3,830,453.

133. In the aggregate, the Insider Seller Defendants sold the following shares of Medpace common stock for the following aggregate proceeds:

| DEFENDANT | POSITION | SHARES SOLD | PROCEEDS |
|---|---|---|---|
| **Troendle** | CEO, Chairman | 364,918 | $207,589,733 |
| **Geiger** | Former President | 86,332 | $45,611,843 |
| **Burwig** | EVP, Operations | 57,500 | $32,459,070 |
| **Ewald** | General Counsel | 18,230 | $10,470,486 |
| **Brady** | CFO, Treasurer | 15,000 | $7,221,810 |
| **Davenport** | Lead Director | 7,684 | $3,991,703 |
| **Kraft** | Director (Audit Cmte.) | 6,472 | $3,830,453 |
| **McCarthy** | Director (Comp. Cmte.) | 1,662 | $772,896 |
| **TOTAL** | | **557,798** | **$311,947,994** |

134. The Insider Seller Defendants timed their sales to coincide with the period during which the Company's stock price was inflated by the false and misleading statements alleged herein, and concentrated their sales in the October–November 2025 period when the stock reached its all-time high price range, preceding the February 10, 2026 corrective disclosure that caused a one-day decline of 15.9% and a peak-to-trough decline of approximately 27%.

135. Each of the open-market sales by the Insider Seller Defendants set forth above required, pursuant to the Insider Trading Policy, the prior pre-clearance of Defendant Ewald, the Company's General Counsel, who held "sole discretion to decide whether to pre-clear any contemplated transaction." Defendant Ewald also made insider sales during the same period, having sold approximately $10,470,486 of Medpace common stock were required to be pre-cleared by Defendant Brady, the CFO (who is an Insider Seller Defendant).

## VI. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

136. Plaintiff brings this action derivatively and for the benefit of Medpace to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties, violations of securities laws, as well as the aiding and abetting thereof.

137. Medpace is named solely as a nominal party in this action.

138. Plaintiff is, and has been at all relevant times, a stockholder of Medpace and was a stockholder of the Company at the time of the misconduct alleged herein. Plaintiff will adequately and fairly represent the interests of Medpace in enforcing and prosecuting its rights and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

139. The current Board of Medpace consists of the following seven directors: Defendants Troendle, Carley, Davenport, Gwadry-Sridhar, Kraft, McCarthy, and Zander. Plaintiff has not made any demand on the current Board to institute this action because such a demand

would be a futile, wasteful, and useless act, as set forth below. The members of the current Board are neither disinterested nor independent.

**A. Demand Upon Defendant Troendle Is Excused**

140. Troendle serves as the Company's CEO and Chairman of the Board and is the Company's founder. Troendle therefore is not independent. As an employee of Medpace, the Company provides Defendant Troendle with his principal occupation from which he receives substantial compensation, including total compensation of $11,443,766 in 2025.

141. Troendle is a named defendant in the Securities Class Action. As such, he cannot act with independence and disinterest regarding a demand concerning the related facts and circumstances pled herein.

142. Troendle personally made the materially false and misleading representations alleged in Section V.D above, including his April 22, 2025 representation that Medpace had "paths toward getting to 1.15" book-to-bill in the back half of 2025; his July 22, 2025 representation that cancellations "were very well behaved in this quarter" and that there was "a reasonable chance of getting book-to-bills back over 1.15x"; and his October 23, 2025 representation that the Company was "looking at" the 1.15 book-to-bill ratio "towards Q4 as sort of the target" and that this "looks reasonable." As a direct result of these representations, Troendle faces a substantial likelihood of personal liability here and in the Securities Class Action.

143. Troendle has a personal relationship with Defendant Burwig. As disclosed in the Company's 2026 Proxy Statement, "Our Chief Executive Officer and founder, August J. Troendle and our Executive Vice President of Operations, Susan E. Burwig, each of whom is a named executive officer, cohabitate." Defendant Burwig is the Company's EVP of Operations, a named executive officer, and an Insider Seller Defendant herein. As domestic partners, Troendle and

Burwig are not independent and disinterested regarding the determination whether to take action against one another for their misconduct alleged herein.

144. Troendle and two other Individual Defendants — Defendants Geiger (former President) and Ewald (General Counsel) — have served together since 2015 as directors of two private companies: LIB Therapeutics, Inc. and CinRx Pharma, LLC. Their financial entanglements and shared director service over more than ten years eliminates Troendle's ability to consider a demand to take action against Geiger or Ewald, with the required independence and disinterest.

145. The co-directorship between Troendle, Geiger, and Ewald at LIB and CinRx is not merely a shared board service; it reflects an ongoing, material related-party relationship that the Company itself has disclosed and quantified in its periodic filings. As disclosed in Medpace's Quarterly Report on Form 10-Q for the period ended June 30, 2025, CinRx maintains a "strategic CRO partnership" with Medpace pursuant to which Medpace performs clinical-trial services for CinRx under task orders, generating $26.8 million in revenue for Medpace in the six months ended June 30, 2025 alone. Medpace likewise performed clinical-trial services for LIB during the same period, with $1.3 million in Accounts receivable and unbilled, net from LIB as of June 30, 2025. As such, Troendle, is not independent of other Inside Seller Defendants and reaped material personal benefits not shared with other Medpace shareholders, and demand upon him is excused.

146. Troendle had a powerful incentive to inflate Medpace's stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. As detailed in Section V.H above, Troendle sold 364,918 shares of Medpace common stock while in possession of material adverse nonpublic information, for aggregate proceeds of approximately $207,589,733, with approximately $150 million of those sales concentrated in November 2025 at the all-time high price range of $591.79 to $611.02 per share. Thus, through materially false and

misleading statements to the market about the Company's financial condition, Troendle sold Medpace stock at artificially inflated prices, reaping a material personal benefit not shared with other Medpace stockholders from the misconduct pled herein and he has a substantial likelihood of liability therefor.

147. Troendle personally beneficially owns approximately 19.6% of the Company's outstanding common stock (5,653,390 shares as of March 19, 2026), including indirect beneficial ownership of 4,733,019 shares held by Medpace Investors, LLC, of which Troendle is the sole manager and controlling unit holder. As founder, CEO, Chairman, and largest stockholder, Troendle exercises substantial control over the Company and the Board, and no other Director Defendant could reasonably be expected to take action adverse to Troendle's interests.

148. Troendle authorized the Proxy Statements containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

149. Troendle benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Medpace Board at the May 16, 2025 Annual Meeting and his re-election to the Board at the May 15, 2026 Annual Meeting, in each case through the false and misleading statements and material omissions in the respective Proxy Statements.

150. Troendle, as a Medpace director, was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Medpace's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's book-to-bill ratio guidance, backlog cancellations, and the concentration of its growth pipeline; (2) effectively oversee and monitor the

material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Troendle taken timely action, the damage caused to Medpace could have been prevented or at least minimized.

151. For the foregoing reasons, Defendant Troendle is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Troendle is futile and, thus, excused.

**B. Demand Upon Defendant Carley Is Excused**

152. Carley is Chair of the Audit Committee. The Audit Committee, under Carley's leadership, was directly responsible for assisting the Board in fulfilling its oversight responsibility relating to the integrity of the Company's financial statements and the review of the Company's earnings releases and financial guidance. Notwithstanding this specific duty, Carley failed to oversee or investigate the Company's public book-to-bill statements and other financial guidance. The Company's repeated representations that cancellations were "well behaved" and that a 1.15 book-to-bill ratio was achievable in the fourth quarter were issued in connection with publicly filed earnings releases and conference calls that were subject to Audit Committee review. Carley's utter failure to perform his Audit Committee duties exposes him to a substantial likelihood of liability for breach of fiduciary duty.

153. Carley, as a member of the Nominating and Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Medpace's Governance Guidelines. Carley utterly failed to perform these duties.

154. Carley authorized the Proxy Statements containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

155. Carley benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Medpace Board at the May 15, 2026 Annual Meeting through the false and misleading statements and material omissions in the 2026 Proxy Statement.

156. Carley's independence is further compromised by his historical relationship with Medpace's independent registered public accounting firm. From 2002 to 2014, Carley served as an audit partner at Deloitte & Touche LLP ("Deloitte") — a period during which Deloitte was Medpace's independent registered public accounting firm. Deloitte has served as Medpace's auditor continuously since 2002. As Chair of the Audit Committee, Carley is now responsible for overseeing the audit work of the very firm where he served as an audit partner for twelve of the years it had Medpace as a client. Carley, as a Medpace director, was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Medpace's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's book-to-bill ratio guidance, backlog cancellations, and the concentration of its growth pipeline; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Carley taken timely action, the damage caused to Medpace could have been prevented or at least minimized.

157. For the foregoing reasons, Defendant Carley is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Carley is futile and, thus, excused.

**C. Demand Upon Defendant Davenport Is Excused**

158. As a member of the Audit Committee, Davenport was directly responsible for assisting the Board in fulfilling its oversight responsibility relating to the integrity of the

Company's financial statements and the review of the Company's earnings releases and financial guidance. Notwithstanding this specific duty, Davenport failed to oversee or investigate the Company's public book-to-bill statements and other financial guidance Davenport's utter failure to perform his Audit Committee duties exposes him to a substantial likelihood of liability for breach of fiduciary duty.

159. Davenport, as a member of the Nominating and Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Medpace's Governance Guidelines. Davenport utterly failed to perform these duties.

160. Davenport authorized the Proxy Statements containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

161. Davenport, as a Medpace director, was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Medpace's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's book-to-bill ratio guidance, backlog cancellations, and the concentration of its growth pipeline; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Davenport taken timely action, the damage caused to Medpace could have been prevented or at least minimized.

162. Davenport had a powerful incentive to inflate Medpace's stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. As detailed in Section V.H above, Davenport sold 7,684 shares of Medpace common stock while in

possession of material adverse nonpublic information, for aggregate proceeds of approximately $3,991,703, including a sale of 5,972 shares on October 30, 2025 — just seven days after the October 23, 2025 earnings call on which Defendants Troendle and Brady made the materially false and misleading representations regarding the Company's third-quarter cancellation rate, book-to-bill outlook, and the breadth of its revenue performance. Thus, through materially false and misleading statements to the market about the Company's financial condition, Davenport sold Medpace stock at artificially inflated prices, reaping a material personal benefit not shared with other Medpace stockholders from the misconduct pled herein and he has a substantial likelihood of liability therefor.

163. For the foregoing reasons, Defendant Davenport is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Davenport is futile and, thus, excused.

**D. Demand Upon Defendant Gwadry-Sridhar Is Excused**

164. Gwadry-Sridhar, as a member of the Nominating and Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Medpace's Governance Guidelines. Gwadry-Sridhar utterly failed to perform these duties.

165. Gwadry-Sridhar authorized the Proxy Statements containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

166. Gwadry-Sridhar benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Medpace Board at the May 15, 2026 Annual Meeting through the false and misleading statements and material omissions in the 2026 Proxy Statement.

167. Gwadry-Sridhar, as a Medpace director, was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Medpace's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's book-to-bill ratio guidance, backlog cancellations, and the concentration of its growth pipeline; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Gwadry-Sridhar taken timely action, the damage caused to Medpace could have been prevented or at least minimized.

168. For the foregoing reasons, Defendant Gwadry-Sridhar is neither disinterested nor independent, and she faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Gwadry-Sridhar is futile and, thus, excused.

**E. Demand Upon Defendant Kraft Is Excused**

169. As a member of the Audit Committee, Kraft was directly responsible for assisting the Board in fulfilling its oversight responsibility relating to the integrity of the Company's financial statements and the review of the Company's earnings releases and financial guidance. Notwithstanding this specific duty, Kraft failed to oversee or investigate the Company's public book-to-bill statements and other financial guidance The Company's repeated representations that cancellations were "well behaved" and that a 1.15 book-to-bill ratio was achievable in the fourth quarter were issued in connection with publicly filed earnings releases and conference calls that were subject to Audit Committee review. Kraft's utter failure to perform his Audit Committee duties exposes him to a substantial likelihood of liability for breach of fiduciary duty.

170. Kraft, as a member of the Nominating and Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Medpace's Governance Guidelines. Kraft utterly failed to perform these duties.

171. Kraft authorized the Proxy Statements containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

172. Kraft benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Medpace Board at the May 15, 2026 Annual Meeting through the false and misleading statements and material omissions in the 2026 Proxy Statement.

173. Kraft's independence is further compromised by his nearly decade-long service on the Medpace Board (since July 1, 2016), which demonstrates his lack of disinterest and lack of independence from Troendle and the other long-tenured officers and directors of the Company.

174. Kraft, as a Medpace director, was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Medpace's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's book-to-bill ratio guidance, backlog cancellations, and the concentration of its growth pipeline; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Kraft taken timely action, the damage caused to Medpace could have been prevented or at least minimized.

175. Kraft had a powerful incentive to inflate Medpace's stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. As detailed in

Section V.H above, Kraft sold 6,472 shares of Medpace common stock on November 14, 2025 while in possession of material adverse nonpublic information, during the November 2025 period when the Company's stock was trading at all-time highs, for proceeds of approximately $3,830,453. Thus, through materially false and misleading statements to the market about the Company's financial condition, Kraft sold Medpace stock at artificially inflated prices, reaping a material personal benefit not shared with other Medpace stockholders from the misconduct pled herein and he has a substantial likelihood of liability therefor.

176. For the foregoing reasons, Defendant Kraft is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Kraft is futile and, thus, excused.

**F. Demand Upon Defendant McCarthy Is Excused**

177. McCarthy, as a member of the Nominating and Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Medpace's Governance Guidelines. McCarthy utterly failed to perform these duties.

178. McCarthy authorized the Proxy Statements containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

179. McCarthy's independence is further compromised by his long-standing personal and professional relationship with Defendant Troendle and Medpace, spanning approximately two decades. From 2006 to 2013, McCarthy served as a director of predecessor entities of Medpace under Defendant Troendle's leadership. During that period and immediately afterward, McCarthy's firm, Fairmount Partners — where McCarthy has served as Managing Director and CEO since 2003 — acted as financial advisor to Medpace on multiple significant transactions, including Medpace's February 2014 sale to private-equity firm Cinven for approximately $915

million, Medpace's earlier 2011 sale of an 80% interest to private-equity firm CCMP Capital, and Medpace's acquisition of European medical-device CRO MediTech Strategic Consultants. McCarthy then rejoined Medpace's board upon its return to public-company status in August 2018. The cumulative effect is that McCarthy has had a continuous commercial and directorial relationship with Defendant Troendle and Medpace dating back nearly twenty years, encompassing both prior board service under Troendle's leadership and direct financial-advisory engagements between McCarthy's firm and the Company. Thus, McCarthy cannot consider a demand requiring him to investigate or pursue claims against Troendle with the required independence and disinterest.

180. McCarthy, as a Medpace director, was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Medpace's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's book-to-bill ratio guidance, backlog cancellations, and the concentration of its growth pipeline; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had McCarthy taken timely action, the damage caused to Medpace could have been prevented or at least minimized.

181. McCarthy had a powerful incentive to inflate Medpace's stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. As detailed in Section V.H above, on August 19, 2025, McCarthy sold 1,662 shares of Medpace common stock while in possession of material adverse nonpublic information, for proceeds of approximately $772,896. Thus, through materially false and misleading statements to the market

about the Company's financial condition, McCarthy sold Medpace stock at artificially inflated prices, reaping a material personal benefit not shared with other Medpace stockholders from the misconduct pled herein and he has a substantial likelihood of liability therefor.

182. For the foregoing reasons, Defendant McCarthy is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant McCarthy is futile and, thus, excused.

**G. Demand Upon Defendant Zander Is Excused**

183. Zander, as a member of the Nominating and Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Medpace's Governance Guidelines. Zander utterly failed to perform these duties.

184. Zander's independence is compromised by the circumstances of her appointment to the Medpace Board. Zander was not elected by stockholders to the Medpace Board; she was instead appointed to fill a Class III director vacancy on July 1, 2024 by unanimous resolution of the then-existing Board, which consisted of Defendants Troendle, Carley, Davenport, Gwadry-Sridhar, Kraft, and McCarthy — the same Director Defendants whose oversight failures are the subject of this action. Zander's continued tenure on the Board depends on the continued goodwill of the directors who selected and appointed her to the Board.

185. Zander authorized the Proxy Statements containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

186. Zander benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Medpace Board at the May 16, 2025 Annual Meeting and her re-election to the Board at the May 15, 2026 Annual Meeting, in each case through the false and misleading statements and material omissions in the respective Proxy Statements.

187. Zander, as a Medpace director, was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Medpace's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's book-to-bill ratio guidance, backlog cancellations, and the concentration of its growth pipeline; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Zander taken timely action, the damage caused to Medpace could have been prevented or at least minimized.

188. For the foregoing reasons, Defendant Zander is neither disinterested nor independent, and she faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Zander is futile and, thus, excused.

**H. Other Factors Demonstrating That Demand Is Excused**

189. Medpace has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

190. The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

191. Publicly traded companies, such as Medpace, typically carry director and officer liability insurance ("D&O Insurance") from which the Company could potentially recover some or all of its losses. However, such insurance typically has limited coverage for actions within the

scope of this Complaint — particularly where, as here, the insured directors are the very defendants from whom the Company seeks to recover, creating an "insured versus insured" exclusion that forecloses recovery if the directors voluntarily institute suit against themselves. The Board has not even attempted to pursue a recovery of the Company's damages from the D&O carrier.

192. The Director Defendants have failed to take any remedial action to address the wrongdoing alleged herein. The Director Defendants have not caused Medpace to terminate any officer for the misconduct alleged herein; have not caused Medpace to recover any compensation from any officer for the misconduct alleged herein; have not established a special committee to investigate the misconduct alleged herein; and have not implemented any internal-control reforms that would prevent recurrence.

## VII. CLAIMS FOR RELIEF

### COUNT I
### Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

193. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

194. The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

195. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security … registered pursuant to section 78l of this title."

196. Rule 14a-9 promulgated under Section 14(a), 17 C.F.R. § 240.14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

197. Under the direction of the Director Defendants, the Proxy Statements failed to disclose that the Medpace Board violated their fiduciary duties to Medpace and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Medpace's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's book-to-bill ratio guidance, its backlog cancellations, and the concentration of its growth pipeline; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

198. Further, the Proxy Statements contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee.

199. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading and omitted material information.

200. The false and misleading statements, and information omitted, from the Proxy Statements were material to Medpace stockholders in voting on the matters set forth for stockholder determination, including but not limited to the re-election of Defendants Troendle, Zander, Carley, Gwadry-Sridhar, and Kraft, the advisory vote on executive compensation, and the amendment of the Company's Certificate of Incorporation to remove supermajority voting requirements.

201. The material misstatements and omissions in the Proxy Statements damaged the Company.

202. Plaintiff, on behalf of Medpace, seeks relief for damages inflicted upon the Company based on the misleading Proxy Statements in connection with the improper election of Defendants Troendle, Zander, Carley, Gwadry-Sridhar, and Kraft, the approval of executive compensation, and the amendment of the Certificate of Incorporation to remove supermajority voting requirements, based upon the solicitations in the Proxy Statements.

**COUNT II**
**Against The Individual Defendants for Contribution Under Section 21D of the Exchange Act**

203. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

204. The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under various federal securities laws by their misconduct.

205. Medpace is named as a defendant in the Securities Class Action, which alleges and asserts claims arising under the federal securities laws. The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If Medpace is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of

the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

206. As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Medpace's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

207. The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

208. The Individual Defendants have damaged the Company and are liable to the Company for contribution.

**COUNT III**
**Against the Individual Defendants for**
**Breach of Fiduciary Duty**

209. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

210. Each of the Individual Defendants owed, and continues to owe, Medpace and its stockholders the highest fiduciary duties of loyalty, good faith, candor, due care, oversight, and fair dealing. By reason of their positions as officers and/or directors of Medpace and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Medpace and its stockholders the obligation to use the utmost ability to manage Medpace in a fair, just, honest, and equitable manner, and to act in furtherance of the best interests of Medpace and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal

interests or benefit. The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

211. The Individual Defendants each violated their fiduciary duties to Medpace and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Medpace's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's book-to-bill ratio guidance, its backlog cancellations, and the concentration of its growth pipeline; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

212. The Individual Defendants further breached their fiduciary duties to Medpace by, *inter alia*, making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings and permitting the Insider Seller Defendants to unload shares on the unsuspecting public while the Insider Seller Defendants were in possession of material nonpublic information.

213. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Medpace's affairs and in the use and preservation of Medpace's assets.

214. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Medpace has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

215. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff, on behalf of Medpace, has no adequate remedy at law.

**COUNT IV**
**Aiding and Abetting Breach of Fiduciary Duty**
**Against the Individual Defendants**

216. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

217. Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

218. In committing the wrongful acts, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

219. Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

220. As a direct and proximate result of the Individual Defendants' aiding and abetting of one another's breaches of fiduciary duty, Medpace has been damaged in an amount to be determined at trial.

221. Plaintiff, on behalf of Medpace, has no adequate remedy at law.

**COUNT V**
**Against the Insider Seller Defendants for a Derivative *Brophy* Claim**

222. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

223. As either directors, officers, or controlling stockholders of Medpace, the Insider Seller Defendants owed fiduciary duties of loyalty and good faith to the Company.

224. The Insider Seller Defendants sold Medpace stock while in possession of material nonpublic information that artificially inflated the price of Medpace stock.

225. By selling Medpace stock while in the possession of material adverse nonpublic information that artificially inflated the price of Medpace stock, the Insider Seller Defendants exploited their positions at Medpace and breached their fiduciary duties to Medpace. The Insider Seller Defendants improperly benefited from their breaches of fiduciary duty and are liable to Medpace for their benefit therefrom.

226. Plaintiff, on behalf of Medpace, has no adequate remedy at law.

**COUNT VI**
**Unjust Enrichment**
**Against the Individual Defendants**

227. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

228. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Medpace, as a result of their compensation and director remuneration and the proceeds which they received as a result of their misstatements and material omissions, while breaching fiduciary duties owed to Medpace.

229. Further, the Insider Seller Defendants sold Medpace stock while in possession of material nonpublic information that artificially inflated the price of Medpace stock. As a result,

the Insider Seller Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

230. Plaintiff, as a stockholder of Medpace and on behalf of the Company, seeks restitution from the Individual Defendants and an order from this Court disgorging all profits, benefits, and other compensation—including any performance-based or incentive compensation and any trading profits—obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

231. Plaintiff, on behalf of Medpace, has no adequate remedy at law.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment, on behalf of Medpace, as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Medpace and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Medpace;

C. Declaring that the Director Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

D. Declaring that the Individual Defendants violated Section 21D of the Exchange Act;

E. Determining and awarding to Medpace the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

F. Directing Medpace and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect Medpace and its stockholders from a repeat

of the damaging events described herein, including but not limited to strengthening the Board's oversight of the Company's public statements concerning operating metrics and forward-looking guidance and strengthening the Company's internal and disclosure controls relating to the same;

G. Awarding Medpace restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation—including performance-based and incentive compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

H. Ordering the Insider Seller Defendants to disgorge and pay to the Company all profits, benefits, and other compensation obtained by their insider trading and breaches of fiduciary duties;

I. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees, costs, and expenses; and

J. Granting such other and further relief as the Court may deem just and proper.

## IX. JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: June 22, 2026

**LAW OFFICES OF JOHN C. CAMILLUS, LLC**

*/s/ John C. Camillus*

John C. Camillus P.O. Box 141410
Columbus, OH 43214
Telephone: (614) 992-1000
Facsimile: (614) 559-6731
Email: jcamillus@camilluslaw.com

*Attorneys for Plaintiff Stephen Bushansky*

Of Counsel:

David C. Katz
Mark D. Smilow
**WEISS LAW**
305 Broadway, 7th Fl.
New York, NY 10007

Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
msmilow@weisslawllp.com

Joshua M. Rubin
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Email: jrubin@weisslawllp.com